ANTHONY GUZZETTA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Guzzetta v. Commissioner
Docket No. 1855-78.
United States Tax Court
T.C. Memo 1982-560; 1982 Tax Ct. Memo LEXIS 194; 44 T.C.M. (CCH) 1230; T.C.M. (RIA) 82560; September 23, 1982. Murray Appleman, for the petitioner. Bradford A. Johnson, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in petitioner's income taxes and additions to tax for the years 1968 through 1974: Additions to Tax
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
Sec. 6654 [1]
1968
$1,186.98
$296.75
$59.35
$37.98
1969
1,839.91
459.98
91.99
58.88
1970
2,408.25
602.06
120.41
77.06
1971
3,497.25
874.31
174.86
111.91
1972
3,320.77
830.19
166.04
106.27
1973
1,511.00
none
75.55
none
1974
1,149.00
287.25
57.45
36.77
*195 The issues for our decision are whether petitioner had unreported income in the amounts determined by respondent and whether petitioner is liable for the additions to tax asserted by respondent. We combine our findings of fact and opinion to facilitate the disposition of the contested issues. Some of the facts have been stipulated. The stipulation and the attached exhibits, including respondent's computation of petitioner's taxable income, are incorporated herein by reference. Petitioner lived in Yonkers, New York, when he filed the petition in this case. Petitioner did not file income tax returns for the years 1968 through 1972. He filed a tax return for 1973 in which he reported income of $480. Petitioner did not file a tax return for 1974. By examining petitioner's cash expenditures and his deposits with the Scarsdale National Bank and Trust Company, respondent determined that petitioner had unreported income for the years 1968 through 1974 in the *196 following amounts: 1968
$11,028.46
1969
9,481.98
1970
16,123.43
1971
19,826.19
1972
19,455.34
1973
8,801.23
1974
8,203.71
Petitioner makes two arguments to support his reporting position: (1) respondent had the burden of proving, and failed to show, that petitioner had unreported income; and (2) a cash hoard provided the source of the cash expenditures and bank deposits which are the basis of respondent's deficiency determination. Petitioner's burden of proof argument is erroneous. Petitioner has the burden of proof in this case. Rule 142 (a); , affd. . The cases cited by petitioner to support his argument that respondent must prove that petitioner had unreported income are distinguishable because they are criminal tax cases in which the government clearly has the burden of proof. Petitioner also asserts that he had no reported income for the years in issue. He contends that the cash expenditures and bank deposits came from a cash hoard accumulated by his wife, Miriam Guzzetta. The issue of whether or not a cash hoard existed is a question *197 of fact. Our resolution of this question turns in large measure on our assessment of the credibility of petitioner and his wife. Petitioner testified that he was involved in no income producing activity during the years 1968 through 1974 other than two weeks of employment in 1973. He reported the earnings from this employment on his 1973 return. Miriam Guzzetta testified that a cash hoard of about $118,113.61 was the source of the cash expenditures and bank deposits which form the basis of respondent's deficiency determination. Miriam testified that the cash hoard was composed of the following items: Item
Date Received
Amount
Miriam's earnings
1965-1970
$ 34,000.00
Receipts from sale of
Tivoli Bar
1967-1969
20,000.00
Gift from Miriam's
mother
about 1961
59,000.00
Unemployment insurance
1970
1,950.00
Liquor license refund
1967
1,305.00
Bottle sale receipts
unknown
1,200.00
Refund from landlord
unknown
300.00
Accident claim
unknown
250.00
Utility refund
1967
108.61
Total cash hoard
$118,113.61
We reject petitioner's argument that these items explain the expenditures and deposits. We will analyze the alleged receipts *198 in three groups: (1) items which respondent took into account in his determination of petitioner's unreported income; (2) items which petitioner has not shown that he or his family actually received; and (3) items received before the years in issue which allegedly were held in a cash hoard until they supposedly were used to fund the contested expenditures and deposits. Miriam's earnings from 1968-1969 and the Tivoli Bar sale receipts from 1968-1969 could not have provided the source for any of the expenditures and deposits which form the basis of respondent's deficiency determination because respondent excluded them from his calculation of petitioner's unreported income. Accordingly, these items do not help petitioner prove that respondent's determination was erroneous. We also reject petitioner's argument that that following items were sources for the disputed expenditures and deposits because petitioner failed to introduce sufficient evidence to show that he or his wife received these items: (1) Miriam's 1970 earnings; (2) 1970 unemployment insurance; (3) accident claim; (4) landlord refund; and (5) bottle sale receipts. The parties stipulated that Miriam was not employed *199 during 1970. Miriam also testified that her employment finished in 1969 and that she did not work in 1970. Accordingly, we find that Miriam had no earnings in 1970. Miriam testified that the Guzzettas received amounts for unemployment insurance, an accident claim, a landlord refund and a bottle sale. Miriam's testimony was sketchy and conclusory. Petitioner offered no other evidence to substantiate these alleged receipts. Petitioner has the burden of proof on this matter. Rule 142(a). We find Miriam's testimony insufficient to satisfy petitioner's burden. Accordingly, we hold that petitioner's family did not receive these funds. Thus, they cannot explain the source of any part of the unreported income determined by respondent. The remaining items which, petitioner contends, explain the source of the contested expenditures and deposits are: (1) Miriam's 1965-1967 earnings; (2) the 1967 Tivoli Bar sale receipts; (3) Miriam's gift from her mother; (4) the liquor license refund; and (5) the utility refund. For the purpose of this opinion we assume, without having to decide, that the Guzzettas in fact received these items. These items all were received before the years *200 in issue. Thus, these funds must have been saved from the time of their receipt until the time of the contested expenditures and deposits in order to explain the source of any of the funds which respondent determined to be unreported income. These items, therefore, present petitioner's cash hoard argument. Petitioner argues that Miriam collected these receipts during the early and mid-1960s, that she converted them into cash and that she stored the cash in a box beneath the family washing machine. The Guzzettas allegedly did not use any of these funds until 1968. Then, throughout the years in issue, and particularly after the termination of Miriam's employment in 1969, the hoard allegedly provided the source for most of the Guzzettas' living expenses. During these years the Guzzettas contributed to the college expenses of their two children, purchased several new cars and maintained a home in Scarsdale, New York. The hoard was exhausted sometime in the late 1970s. Miriam reentered the labor market at that time as an executive secretary to support the petitioner and herself. Miriam testified that the reason why she maintained a cash hoard was because she did not trust *201 banks. She recounted a time during the 1930s when she stood in line in front of a failed bank holding her father's hand, hoping to retrieve a portion of the money he had deposited there. This experience, Miriam testified, convinced her to keep her money in cash outside of banks. We find petitioner's cash hoard story incredible. We will discuss only some of the inconsistencies in this record which convince us that petitioner and his wife were not credible witnesses and that they did not accumulate a cash hoard in the way described by Miriam. Despite Miriam's alleged fear of banks she and petitioner kept substantial funds in several banks, including the Scarsdale National Bank and Trust Company, the Edison Savings and Loan Association, The Home Savings Bank and The County Trust Company. The Guzzettas deposited between $8,000 and $17,000 each year in the Scarsdale bank. We think that the Guzzettas' extensive use of banks severely discredits Miriam's testimony concerning her alleged fear of banks. The Guzzettas also obtained several loans during the 1960s and 1970s. Pursuant to these loans and other credit arrangements, petitioners paid the following amounts in interest: *202 Year
Interest Payment
1968
$2,133.65
1969
346.29
1970
1,666.81
1971
1,615.40
1972
1,451.56
Paying these significant amounts of money as interest during years when the Guzzettas allegedly had little if any income and allegedly had a large hoard is incredible. We think that if the Guzzettas had a cash hoard, then they would have paid off the amounts they owed or paid for items in cash so that they would not be burdened with the additional expense of interest. The incentive to avoid interest payments of the magnitude involved in this case would be particularly strong in years of little or no income, which petitioner argues is his situation. We find that these facts, when taken together, discredit Miriam's cash hoard story. We also find Miriam's story unreliable because of contradictions between her testimony and other facts in the record. For instance, Miriam attempted to explain the source of payments for a 1970 MGB Roadster which the family purchased on January 29, 1970, for $3,184.24. The car was paid for with a down payment of $242.18, a trade-in of $800.00 and cash on delivery of $2,142.06. Miriam testified that $900 of the cash came from proceeds *203 which her son received from the sale of a motorcycle. Yet the bill of sale for the motorcycle shows that it was sold on June 24, 1971, over 17 months after the purchase of the MGB. Discrepancies such as this one lead us to conclude that Miriam's testimony is not reliable unless substantiated. Unfortunately for petitioner the cash hoard story is based solely on Miriam's testimony. No objective evidence of the existence of a cash hoard was provided to the Court. Petitioner must bear the consequences of the record he created. Based on a review of these facts, we conclude that petitioner failed to prove that a cash hoard in fact provided the source for the expenditures and deposits upon which respondent based his deficiency determination. In addition, there is evidence in the record that, for at least a part of the period in issue, petitioner worked for an illegal gambling operation. Police officers testified that petitioner was a "banker" in a "numbers" game.The banker occupies a trusted position which requires expertise. A police officer, whose experience qualifies him as an expert in such matters, opined that bankers generally work for money and are well paid. Petitioner's *204 participation in such an operation, therefore, supports the inference that petitioner was in fact engaged in an income producing activity during the years in issue. Petitioner argues that no evidence supports the conclusion that petitioner was involved in the gambling operation. Petitioner's argument relies primarily on the fact that the search warrant pursuant to which petitioner, his house and his wife's car were searched was later declared void by a state court. But, as we discussed in a prior opinion in this case, , the evidence obtained during the search and seizure is admissible in this proceeding. Betting slips obtained at the time of petitioner's arrest, petitioner's statements at the time of his arrest, paraphernalia seized in petitioner's home during the search and testimony by policy officers concerning petitioner's role in the numbers game indicate that petitioner was involved in the gambling operation. Petitioner introduced no evidence which controverts this evidence. We find this evidence highly probative in this unearned income case because it provides an explanation for the expenditures and deposits *205 highlighted by respondent and discredits the cash hoard story. Petitioner also contends that the evidence obtained at the time of his arrest indicates that he was involved in the gambling activity only for a short time during the early part of 1973. It is true that the direct evidence of petitioner's participation in the gambling operation demonstrates involvement only during the short period before his arrest. However, petitioner's role as a banker implies involvement on a consistent basis over a long period because he had to develop the necessary expertise and trust required for the job. We note again that we would hold that petitioner failed to satisfy his burden of proving that respondent's deficiency determination is erroneous without the evidence of petitioner's involvement in the gambling operation. Thus, petitioner's participation in the numbers game only reinforces our conclusion that petitioner is liable for the deficiencies in tax as determined by the respondent. Additions to Tax
Respondent also asserted additions to tax pursuant to sections 6651(a), 6653(a) and 6654. Petitioner has the burden of proof on these issues.Rule 142(a). Petitioner introduced *206 no evidence on these matters. Accordingly, we hold that petitioner is liable for the additions to tax as determined by the respondent. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩